UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kenyetta Thomas,

       Plaintiff,

v.

Doan Construction Company,

       Defendant.

_____/

Case No. 13-11853

Honorable Nancy G. Edmunds

### OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT [12]

Plaintiff Kenyetta Thomas has filed this Family and Medical Leave Act, 29 U.S.C. § 2611, et seq.(FMLA), and Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (FLSA), action against her former employer, Defendant Doan Construction Company. (Dkt. 1.) She alleges that Defendant violated her FMLA rights when it terminated her in retaliation for taking time off to care for her dying biological father. She also alleges that Defendant violated her FLSA rights when it did not pay her for overtime, to which she claims she was entitled, because Defendant characterized her as a salaried employee.

Defendant has filed a motion for partial summary judgment. Defendant argues that Plaintiff's FMLA claim fails because she cannot establish that she was entitled to FMLA leave, that Defendant did not know she was exercising FMLA leave, and because she cannot establish causation. As to the FLSA claim, Defendant seeks partial summary judgment as to the proper measure of damages and the proper statute of limitations.

Because the Court finds that Plaintiff has made the required modest showing of a prima facie case of FMLA retaliation, the Court DENIES Defendant's motion for summary judgment on the FMLA claim.  Because the Court finds that a factual issue exists as to the parties' understanding about the hours Plaintiff would work, the Court DENIES without PREJUDICE Defendant's motion for summary judgment on the calculation of damages on her FLSA claim.  And finally, because the Court agrees with Defendant that Plaintiff has brought forth no evidence that Defendant willfully violated the FLSA, the Court GRANTS Defendant's motion for summary judgment on the willfulness statute of limitations issue.

## I.   Facts

### A.  Plaintiff's facts

In 1995, Plaintiff started work as a secretary at Ernst Concrete and Supply.  (Def.'s Mot. for Summ. J., Ex. 8, Pl.'s Dep. at 9.)  In 2000, Defendant purchased Ernst.  (*Id.* at 9-10.)  When Defendant purchased Ernst, Plaintiff was still a secretary, but she was also training for various other positions.  (*Id.* at 10.)

As time went on while working for Defendant, Plaintiff states that she had increased responsibilities.  (Pl.'s Dep. at 10.)

By 2010, Plaintiff states that she was transitioning from working in accounts payable to payroll.  (Pl.'s Dep. at 13.)

Plaintiff does not mention any problems that she and Defendant had with her or with her work product for the first twelve years she had been working for Defendant.  Problems started, though, in June, 2012, when Plaintiff got married and took her honeymoon.  (Pl.'s Dep. at 116-17.)  Defendant paid for Plaintiff and her husband's travel and hotel as a honeymoon gift.  (*Id.*)

2

The first report of any problem between Plaintiff and Defendant occurred on June 26, 2012, when Plaintiff had an interaction with Kevin Hoatlin, Defendant's chief financial officer and Plaintiff's boss.  (Pl.'s Dep. at 120.)  She states that he was being "moody" and had said some things, which she could not recall, and that she then took her lunch break early, at 11:15 am, and then she did not go back to work.  (*Id.*)

In July, 2012, Plaintiff states that she learned that her biological father, Joe Whiteside, who lived in Alabama, was diagnosed with pancreatic cancer and that she learned that he had two to three months to live.  (Pl.'s Dep. at 122.)

Prior to the diagnosis, Plaintiff states that she did not see her biological father frequently, for he had retired in Alabama.  (Pl.'s Dep. at 122.)  She says that she talked with him over the phone, but that there was a period of time that he was not in her life.  (*Id.*)  She  explains that he was not in her life when she was young, but that they eventually, prior to 2000, took steps to rebuild their relationship.  (*Id.*)  She states that he came to stay with her in 2005, for several months, but then that he went back to Alabama.  (*Id.* at 123.)  After 2005, she did not see him that frequently, but she says that she spoke with him several times per month on the phone.  (*Id.*)

Around August 28 or 29, 2012, Plaintiff states that her biological father moved to Michigan so that she could care for him.  (Pl.'s Dep. at 124.)  From the time Whiteside went to live with Plaintiff until his passing in early October, 2012, Plaintiff states that she was his primary caregiver.  (*Id.* at 123-25.)  She explains that she took time off and did not work regular business hours during this period.  (*Id.* at 166-67.)  She maintains that she worked during the evenings and weekends.  (*Id.*)  She further maintains that she took several full and part days off during September and October to care for her father.

3

On October 16, 2012, Plaintiff states that she filled out FMLA paperwork and gave it to Hoatlin. (Pl.'s Dep. at 129.) The paperwork indicates that she gave it to Hoatlin around eleven a.m. and that she intended it for her employee folder. (*Id.*)

Plaintiff states that the reason she gave Hoatlin the FMLA paperwork was to show that her biological dad did have cancer and that he needed her to care for him. (Pl.'s Dep. at 143.) She also claims that she submitted the information so that she would create a paper trail, to have something in her employee folder. (*Id.*)

In November, 2012, Plaintiff had a discussion with Hoatlin and Matt Doan, Defendant's owner and Hoatlin's boss, about her work availability. (Pl.'s Dep. at 144.) She explains that they wanted her to get back to a normal schedule. (*Id.*) She also explains that they wanted her to catch up with some items that were not yet completed, such as some open employee folders and certified payrolls. (*Id.*) She says that Hoatlin made a comment to her that she took as a threat about her job. (*Id.*)

Plaintiff states that, in January, 2013, Hoatlin became more hostile to her because of her turning in the FMLA paperwork. (Pl.'s Dep. at 157.) She explains that she has no reason to believe it was because of her work performance. (*Id.*)

In February, 2013, Defendant terminated Plaintiff. Immediately preceding Plaintiff's termination, Plaintiff was working on reports in preparation for an audit that Defendant's auditors were going to conduct on Monday, February 11, 2013, the day Hoatlin fired Plaintiff. Hoatlin had been out of the office at the end of the week before the audit. Plaintiff admits that she did not finish the reports she is accused of not finishing. Plaintiff explains that that week, two coworkers had been out, one was sick, and one left early. (Pl.'s Dep.

at 152.) Plaintiff adds that Hoatlin had to complete one of the tax reports, and because he had not completed it, he was holding her up. (*Id.* at 158-59.)

On February 22, 2013, Plaintiff submitted a letter memorializing and disputing the events that led up to her termination. (Pl.'s Resp., Ex. 6.) Plaintiff states that she arrived at 7:30 a.m. on Monday February 11, 2013. (*Id.*) She explains that she arrived early that day to work on and complete the remaining items for the audit. (*Id.*) She adds that she had had an email discussion with Hoatlin about the audits on Saturday. (*Id.*)

Plaintiff maintains that Hoatlin had told his staff, on January 10, 2013, that they were no longer supposed to communicate by text messages, so she emailed him. (Pl.'s Resp., Ex 6.)

Plaintiff states that the items that still needed completing related to the tax portion of the audit, which she alleges Hoatlin told her, on Thursday, January 31, 2013, that they would have time to complete while the auditors were on site. (*Id.*)

On February 11, 2013, Plaintiff alleges that, when Hoatlin entered her office to return the monthly fixed assets spreadsheet, Hoatlin was already angry. (Pl.'s Resp., Ex. 6.) She states that he asked her about the pension reports and why they were not on the "s" drive. (*Id.*) She states that she responded that she had not worked on those reports and that she believed that they were saved on another co-worker's computer. (*Id.*)

She maintains that he started raising his voice at her about not communicating with him and she claims that she told him that she had emailed twenty-seven reports to him on Saturday for him to review. (Pl.'s Resp., Ex. 6.) She claims he took issue with the fact that she took eight hours to respond to his text. (*Id.*) She also claims that he asked about the Fixed Asset Tax Report and why she had not completed it. (*Id.*) She explains that she told

5

him that she would need help with the report.  (*Id.*)  She also says that he continued talking to her with a raised voice and asked her why she had not told him last week.  (*Id.*)  She says she turned her back to him so that she could open a file on her computer.  (*Id.*)  And she says that she explained that one co-worker had been out sick and the another had left early one day and was out another day.  (*Id.*)

She states that Hoatlin then yelled "get out" and pointed his finger in her face.  (Pl.'s Resp., Ex. 6.)  She claims that she grabbed her phone and he told her that she had to leave the phone, since it was a company phone.  (*Id.*)  She claims that she responded that the phone had videos of her dead father on it and that she would return the phone by Friday.  (*Id.*)

She states that she then called Matt Doan, Hoatlin's boss and the company's owner, and told him that Hoatlin had just fired her.  (Pl.'s Resp., Ex. 6.)  She claims that Doan said that he needed to speak with Hoatlin.  (*Id.*)

At the end of her letter, Plaintiff states that she has been suffering abuse from Hoatlin since June 28, 2012 and since she turned in her FMLA papers for caring for her father.  (Pl.'s Resp., Ex. 6.)  She maintains that she loved working for Defendant, and that the company treated her like family until she turned her FMLA papers in.  (*Id.*)  She comments that she was trusted, her ethics were unquestionable, that her work performance was stellar, and that she worked above and beyond the time required of her, so that she could ensure that company standards were upheld.  (*Id.*)

### B.  Defendant's facts

Defendant has submitted Kevin Hoatlin's affidavit in support of its motion. (Def.'s Mot. for Summ. J., Ex. 1, Hoatlin Aff.)  Hoatlin is currently Defendant's chief financial officer.  (*Id.*

¶ 2.)  Since 1997, he has worked for Defendant.  (*Id.* ¶ 3.)  He has been its CFO since 2002.  (*Id.*)  He states that he was Plaintiff's supervisor for over ten years.  (*Id.*)  He states that Plaintiff has received a fixed salary for the entire time he has worked with her.  (*Id.* ¶ 2.)

Starting in 2010, Hoatlin explains that Plaintiff was Defendant's payroll manager.  (Hoatlin Aff. ¶ 5.)  He says that her duties included overseeing the payroll for all of Defendant's employees, except for the executive team, which included Plaintiff.  (*Id.*)

Hoatlin maintains that Plaintiff was a "good employee" for more than ten years.  (Hoatlin Aff. ¶ 10.)  But in 2011, Hoatlin explains that Plaintiff's performance review was disappointing.  (*Id.*)  He states that Plaintiff "did not engage fully in the process like she had in previous years."  (*Id.*)  He claims, though, that Plaintiff nevertheless received a $2,000.00 "net bonus for 2011.  (*Id.*)

Hoatlin states that, after Plaintiff became engaged in 2012, "she became distracted with phone calls and personal issues."  (Hoatlin Aff. ¶ 14.)  He adds that she "began to close her office door and was often not available even though she was physically present in the office."  (*Id.* ¶ 15.)

Hoatlin states that, in 2012 and 2013, Plaintiff's "performance was inconsistent and sub-standard, and her communication was [] unprofessional at times."  (Hoatlin Aff. ¶ 17.)  As an example, Hoatlin points to June 26, 2012, when Plaintiff "became angry and left suddenly at around 11:00 a.m. and did not return."  (*Id.*)  He adds that she did not return phone calls or text messages that day.  (*Id.*)

Hoatlin explains Defendant's vacation and sick days policy as applicable to Plaintiff–twenty days of vacation and sick time combined.  (Hoatlin Aff. ¶ 19.)  In 2012,

Hoatlin maintains that Plaintiff exceeded her vacation and sick days and that Defendant still paid her for those thirty-five days that she did not work.  (*Id.* ¶ 21.)

Hoatlin states that Plaintiff requested time off on September 18, 2012 so that she could help her father with a doctor's appointment.  (Hoatlin Aff.  ¶ 23.)  Hoatlin states that Defendant paid Plaintiff for that time off.  (*Id.*)  At that time, Hoatlin says that he did not question whether the person for whom she was taking time off was her father.  (*Id.*)

Hoatlin recounts that Defendant also paid Plaintiff for her time off on September 19, 27, and 28, and October 3-5, 2012. (Hoatlin Aff. ¶ 24.)

On October 16, 2012, Plaintiff gave Hoatlin an FMLA form for her employee folder. (Hoatlin Aff. ¶ 25.)

In November, Defendant paid Plaintiff for three days off, for her travel to Alabama for her father's funeral.  (Hoatlin Aff. ¶ 26.)

Hoatlin maintains that he never thought or believed that Plaintiff had taken any FMLA leave.  (Hoatlin Aff. ¶ 27.)  He suggests that the paperwork Plaintiff gave him for her employee file was given "after the fact, when the leave and the funeral had already concluded."  (*Id.*)

Hoatlin states that Plaintiff never offered to switch her leave from paid to unpaid "as would have been permitted under FMLA."  (Hoatlin Aff. ¶ 28.)

Hoatlin states that, despite Plaintiff's "sub-standard performance" in 2012, Defendant paid her a $750.00 "net bonus," the same amount it paid a similarly-situated employee, in addition to paying for her thirty-five days off.  (Hoatlin Aff. ¶ 29.)

Immediately before terminating Plaintiff, Hoatlin explains that he was out of the office, Wednesday through Friday.  (Hoatlin Aff. ¶ 32.)  He explains that, before he left for the

8

week, he "emphasized" to Plaintiff that certain audit reports needed to be ready when he returned, on February 11, 2013, since Defendant's auditor would be auditing Defendant that day.  (*Id.*)  Hoatlin claims that he asked Plaintiff to "follow up" with him on Saturday, February 9, 2013, so that they would be ready for the Monday morning audit.  (*Id.* ¶ 33.) Hoatlin states that he called Plaintiff twice on that Saturday, but that she did not answer or return the phone calls.  (*Id.* ¶ 34.)

When Hoatlin arrived to work on Monday, February 11, 2013, he states that he asked Plaintiff about the reports, and she told him that the reports were not finished.  (Hoatlin Aff. ¶35.)  He states that union reports were also due that day and were not done.  (*Id.* ¶ 36.) He recounts that he asked Plaintiff why the reports were not done and why she did not contact him if she was having difficulty preparing the reports. (*Id.* ¶ 37.)  He alleges that she put her hand up in a "stop" signal and "avoided answering by making excuses as to why the work supposedly was not done."  (*Id.*)  He states he asked her again why she did not answer his calls.  (*Id.* ¶ 38.)  He says that she then "turned her body away from" him and told him that she was not going to talk to him anymore.  (*Id.* ¶ 39.)  He then says that he told Plaintiff "that if she couldn't talk with me, [he] no longer needed her services."  (*Id.* ¶ 40.)

Hoatlin maintains that he terminated Plaintiff for her failures of communication and her failure to complete important time-sensitive reports for the audit.  (Hoatlin Aff. ¶ 41.)

He states that he "honestly believed at the time and still [believes] today that [he] could not work with [Plaintiff] given her failure to do her job and her refusal to follow up and communicate professionally with [him.]" (Hoatlin Aff. ¶ 42.)

Hoatlin says that he terminated Plaintiff at 8:15 a.m. that Monday morning and that Defendant paid Plaintiff for two hours of work.  (Hoatlin Aff. ¶ 43.)

## II.   Rule 56 motion for summary judgment standard

It is well established that summary judgment under Federal Rule of Civil Procedure 56 is proper when the movant "shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *U.S. SEC v. Sierra Brokerage Services, Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* Furthermore, the "substantive law will identify which facts are material, and summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When considering the material facts on the record, a court must bear in mind that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*,  477 U.S. at 252.

## III.   Analysis

### A. Plaintiff has met the modest burden of setting forth a prima facie case of FMLA retaliation

Plaintiff alleges that Defendant violated the FMLA when Hoatlin terminated her, at least in part, for exercising her FMLA rights.  Defendant argues that Plaintiff cannot prove all of the elements of a prima facie case of FMLA retaliation.

10

To establish a prima facie case of FMLA retaliation, Plaintiff must show by a preponderance of evidence that (1) she was engaged in an activity protected by the FMLA; (2) that Defendant knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, Defendant took an adverse employment action against her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Tillman v. Ohio Bell Tel. Co.,* —F. App'x—, 2013 WL 5539612, at *8 (6th Cir. Oct. 8. 2013) (citations omitted).

Defendant argues that Plaintiff's FMLA retaliation claim fails at the first, second, and fourth elements of a prima facie case. (Def.'s Mot. at 7.) Defendant first argues that Plaintiff cannot sustain her burden of proof that Joe Whiteside was her father, Defendant therefore alleges that Plaintiff cannot show that she engaged in a protected activity. Defendant then argues that Plaintiff cannot show that Defendant ever knew that Plaintiff was taking FMLA-designated leave. (*Id.* at 7-8.) And Defendant finally argues that Plaintiff cannot satisfy the causation element. (*Id.* at 8.)

### 1. Plaintiff has brought forth evidence that she engaged in an FMLA protected activity

Under the FMLA, a person seeking leave must show that she engaged in protected activity. Here, Plaintiff argues that she did engage in protected activity when she took care of her alleged biological father, Joe Whiteside, during the last days of his life as he was dying from pancreatic cancer.[1]

---

[1]The FMLA entitles an eligible employee to twelve workweeks of leave during any twelve month period in order to care for a parent, if the parent has a serious health condition. 29 U.S.C. § 2612(a)(1)(C).

11

Defendant argues that Plaintiff cannot legally prove that Joe Whiteside was her biological father.  Defendant represents that, after Plaintiff's deposition, it obtained Plaintiff's marriage certificate.  (Def.'s Mot. at 5.)  Defendant states that Plaintiff's marriage certificate lists Willie G. Thomas, the man who was married to her mother during her birth, as her father.  (*Id.*)

Under FMLA regulations, "[p]arent means biological, adoptive, step or foster father or mother, or any other individual who stood in loco parentis to the employee when the employee was a son or daughter as defined in paragraph (d) or this section."  29 C.F.R. § 825.122(c).  Under the FMLA, a parent-in-law is not a parent.  *Id.*

Here, Plaintiff argues that Joe Whiteside was her biological father, and therefore that she was entitled to take FMLA leave to care for him.  In support of her argument, she has her deposition testimony and her mother's affidavit.  Alabama Thomas, Plaintiff's mother, has submitted an affidavit explaining the circumstances surrounding Plaintiff's birth.  Ms. Thomas states that she married Willie George Thomas on July 27, 1965.  (Thomas Aff. ¶ 3.)  Six years later, in 1971, Ms. Thomas states that she separated from Mr. Thomas and never resided with him again.  (*Id.* ¶ 4.)  She adds that she and Mr. Thomas were divorced in 1990.  (*Id.*)

On September 1, 1972, Ms. Thomas gave birth to Plaintiff, "at least fifteen months after [her] separation from Mr. Thomas and any conjugal relations between [them.]" (Thomas Aff. ¶ 5.)  Ms. Thomas states that she lived with Whiteside for several years and that she had three children with him. (*Id.* ¶ 8.)  Ms. Thomas explains that, in 1980, she attempted to have Plaintiff's birth certificate to reflect the correct paternity.  (*Id.* ¶ 10.)  But, Thomas states, because there has been no judicial determination of paternity, she could

only get an amendment to reflect Plaintiff's true name, Kenyetta Paulette Whiteside. (*Id.*) Thomas states that Whiteside is Plaintiff's biological father. (*Id.* ¶ 9.)

Defendant argues that Plaintiff cannot prove that Whiteside was her biological father. Defendant points to requests for admissions that it sent to Plaintiff, to which Plaintiff responded that Whiteside was not listed as her father on her birth certificate and her marriage certificate and never filed a paternity suit to establish his paternity.[2]

Defendant points to Michigan law and the Michigan Parenting Act to argue that Plaintiff cannot legally show that Whiteside was her biological father and therefore that her FMLA claim must fail because the time she spent caring for him while he was in hospice is not a protected activity under the FMLA.

Defendant argues that *Barnes v. Jeudevine*, 718 N.W.2d 311 (Mich. 2006), should persuade the Court that Plaintiff's FMLA claim must fail. In *Barnes*, the court addressed whether the plaintiff, a man seeking to establish that he was a child's legal father, had standing under Michigan's Paternity Act to seek a determination of paternity. 718 N.W.2d

---

[2]    Defendant sent requests for admissions to Plaintiff. (Def.'s Mot., Ex. 7, Pl.'s Req.for Admiss.) Plaintiff admitted that she was born on September 1, 1972, while her mother was still legally married to Willie George Thomas. (*Id.*) She also admitted that a court never adjudicated whether Willie George Thomas was not her biological father. (*Id.*) Plaintiff also acknowledged that she listed Willie George Thomas as her father on her marriage license. (*Id.*) But she clarified that "she was not permitted to list her actual father, Joe Whiteside, on the marriage license because he was not named as her father on her birth certificate." (*Id.*)
    In the admissions, Plaintiff also admitted that Joe Whiteside never adopted her, never married her mother, and that she was never a foster child. (Def.'s Mot., Ex. 7.) She also admitted that Joe Whiteside was not listed as her father on her birth certificate. (*Id.*) But she added that her amended birth certificate lists her name as Kenyetta Whiteside. (*Id.*)
    Plaintiff also admitted that she never filed a paternity suit against Joe Whiteside and that Joe Whiteside never filed a paternity suit claimed that she was his child. (Def.'s Mot., Ex. 7.)

at 312.  The court held that he did not have standing.  *Id.*  The case deals with the procedures a person must go through to establish contested paternity over a child.

Defendant asserts, and is correct, that, to establish paternity of a child who was born during a marriage, a party must have a judicial determination that the child in question was not the issue of the marriage before the child turns eighteen years old.  *Barnes*, 718 N.W.2d at 314 (citation omitted).  This judicial determination is necessary in Michigan, the Court notes, because there is a "presumption that children born or conceived during a marriage are the issue of that marriage[.]" *Id.* (citation omitted).  But, that presumption of legitimacy can be overcome by a showing of clear and convincing evidence.  *Id.* (citation omitted).

Here, the Court acknowledges Defendant's argument and the fact that there was no judicial determination that Whiteside was Plaintiff's biological father.  But the Court finds that Plaintiff's sworn statement and her mother's affidavit is sufficient to satisfy Plaintiff's modest burden of showing the first element of prima facie FMLA case, that she was entitled to FMLA leave to care for her alleged biological dad.  This case is not a paternity suit.  The strictures of Michigan law and its Paternity Act are not at issue here.  The Court finds that a jury could believe that Plaintiff took leave to care for her biological dad.  Her testimony and Ms. Thomas's affidavit are sufficient to meet the first element of a prima facie case of retaliation.

Defendant objects to the affidavit.  (Def.'s Reply at 2.)  Defendant argues that Plaintiff's mother was not on her witness list and that the affidavit is therefore inadmissible.  (*Id.*)  Defendant maintains, and is correct, that under the Acknowledgment of Parentage Act, for a properly executed affidavit of parentage, the child must be "born out of wedlock."

14

*Aichele v. Hodge*, 673 N.W.2d 452, 458 (Mich.Ct.App. 2003). Here, Plaintiff was not born out of wedlock, and the parties acknowledge so.

The Court permits the affidavit and will permit the testimony of Plaintiff's mother, if need be, over Defendant's arguments. Again, this is not a suit to establish parental rights. That fact takes this case out of the realm of a paternity suit and the cases addressing the proper procedures to establish paternity.

The Court finds that, more likely than not, Defendant's argument in its brief may be the first time that Plaintiff knew that Defendant was going to challenge that she was entitled to FMLA leave. The Court finds that the affidavit in response, while tardy, was not done in bad faith.

### 2.  Defendant knew of Plaintiff's potentially-qualifying FMLA leave

Defendant next argues that Plaintiff cannot establish that Defendant knew Plaintiff was exercising FMLA rights. (Def.'s Mot. at 10.) Defendant states that it gave and paid Plaintiff for time off that exceeded the company's personal and sick time off. (*Id.*) Defendant states that, eleven days after Plaintiff's biological father died, on October 16, 2012, Plaintiff turned in an FMLA form to Hoatlin but told him that it was just for her file. (*Id.* at 11.)

The FMLA form that Plaintiff turned in to Hoatlin is titled "Certification for Health Care Provider for Family Member's Serious Health Condition." (Def.'s Mot., Ex. 10.) Both Plaintiff and a medical provider filled out the form. Plaintiff dated the form September 18, 2012. The medical provider dated the form September 21, 2012. (*Id.*) Defendant did not fill out the form. (*Id.*)

15

Defendant argues that, because Plaintiff had already taken leave and because the leave was paid, not unpaid, Defendant and Hoatlin never believed that Plaintiff was using FMLA leave.  (Def.'s Mot. at 11.)

The Court rejects Defendant's argument.  Here, there is evidence that Plaintiff informed Defendant that she needed to take time off because of her sick father.  She also reaffirmed the need to take care of her sick father when she filled out the FMLA form and turned it in to Hoatlin.

Under the FMLA, "an employee does not need to use the name of FMLA in her request for FMLA-qualifying leave."  *Robinson v. T-Mobile*, 663 F.Supp.2d 604, 614 (M.D.Tenn. 2009) (citation omitted); see also 29 C.F.R. § 825.303(b).  What is required of an employee is that she provided "notice to the employer as soon as practicable under the facts and circumstances of the particular case."  29 C.F.R. § 825.303(a).  The notice must provide " sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request."  29 C.F.R. § 825.303(b).  An employee need not mention the FMLA by name.  *Id.*

Here, Plaintiff did all that was required of her under the FMLA, she informed Defendant of her need to care for her sick father and she reaffirmed the need, with specifics and a medical provider's signature, after her leave.  *See Robinson*, 633 F.Supp.2d at 614-15 (noting that courts in the Sixth Circuit have found that an employee gave sufficient notice that a leave may have qualified under the FMLA  when the employee called her employer and said that her daughter was sick and then, upon returning to work, reiterated that the child was sick.) (citations omitted).

Plaintiff therefore satisfies the second element of a prima facie case.

16

Defendant argues that Plaintiff cannot claim that she had unpaid FMLA leave because it paid her. Whether Defendant paid Plaintiff for the leave does not change the analysis. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012) ("The FMLA does not preclude employers from offering employees paid medical-leave benefits in tandem with FMLA unpaid leave; in fact, an employer may require an eligible employee to substitute accrued paid leave for unpaid FMLA leave, with such paid leave to run concurrently with the FMLA leave." "If an employee does not comply with the additional requirements in an employer's paid leave policy, the employee is not entitled to substitute accrued paid leave, but the employee remains entitled to take unpaid FMLA leave.").

### 3. Plaintiff has made the modest showing necessary to establish a causal connection between her alleged FMLA leave and her termination[3]

---

[3]The Court notes that there is an issue on which standard applies to Plaintiff's claims: the single-motive *McDonnell Douglas* burden shifting standard or the mixed-motive standard. The Sixth Circuit has stated that "the standard applicable to employment discrimination claims 'depends not on the type of evidence presented (direct versus circumstantial), but on the type of claim brought (single-motive versus mixed-motive).'" *Grubb v. YSK Corp.*, 401 F. App'x 104 (6th Cir. 2010) (quoting *Hunter v. Valley View Schs.*, 579 F.3d 688, 692, n. 2 (6th Cir. 2009). The Sixth Circuit has additionally stated that "single-motive and mixed-motive theories are not distinct claims, but rather different ways of analyzing the same claim." *Griffin v. Finkbeiner*, 689 F.3d 584, 594, n. 7 (6th Cir. 2012). While a district court must, at some time, determine whether the case involves a mixed-motive or single-motive claim, that decision "may not always occur before the summary-judgment stage, because the nature of an employment-discrimination case will often emerge after discovery or even at trial." *Id.* (citations and internal quotation marks omitted). *See Callaway v. Academy of Flint Charter Sch.*, 904 F.Supp.2d 657 (E.D.Mich. 2012) (Edmunds, J.).

    Some FMLA interference and retaliation claims are subject to the burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). If Plaintiff properly pleads a prima facie case, then Defendant bears the burden to show that it had "a legitimate reason unrelated to the exercise of FMLA rights for terminating [Plaintiff.]" *Donald*, 667 F.3d at 762. If Defendant shows this legitimate reason, then Plaintiff bears the burden to show that the "proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination." *Id.*

As to the last prima facie case element, Defendant argues that Plaintiff cannot demonstrate a causal connection between taking leave to care for her biological father and Defendant terminating her.  (Def.'s Mot. at 11.)  Defendant maintains that the time between Plaintiff's alleged FMLA leave and her termination does not create an indicia of causation. Defendant additionally argue that, even if Plaintiff were to establish causation, Defendant had an honest belief in its reason to terminate Plaintiff and therefore can take advantage of the "honest belief" rule.  (Def.'s Mot. at 12.)

Plaintiff argues that she has put forth enough evidence, direct and circumstantial combined, to satisfy her burden in putting forth a prima facie case of retaliation, based on the argument that her FMLA leave was a factor in her termination.  (Pl.'s Resp. at 10.) Plaintiff also argues that Defendant cannot avail itself of the "honest belief" rule."  (*Id.* at 12-13.)

In the Sixth Circuit, temporal proximity matters.   *Seeger*, 681 F.3d at 283-84.  Put another way, the closer an adverse action is to an employee's taking protected leave, the more probable that the adverse action was based on the protected leave.  *Id.*

Here, Defendant states that the around-four-months between Plaintiff's leave and her termination is too long of a time span for the Court to find that it satisfies the causal

---

Under a mixed-motive theory, a plaintiff can prove "by either direct or circumstantial evidence that her FMLA was a motivating factor" in her termination.  *Wallner v. J.J.B. Hillard, W.L.Lyons, LLC,* 11-00359, 2013 WL 5934145, at *13 (W.D.Ky. Nov. 5, 2013) (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)).  "This burden of producing some evidence in support of a mixed-motive claim is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim."  *White*, 533 F.3d at 400 (citation omitted).

18

connection element.  Defendant relies on *Seeger*, stating that the *Seeger* court did not recognize a case in which the Sixth Circuit held that four months between the FMLA leave and the adverse action was sufficient to indicate retaliation.

Defendant is correct that *Seeger* does not point to a case in which the temporal proximity was greater than three months.  But, the Sixth Circuit has also stated that "previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000) (citation omitted).

Defendant, though, does not address Plaintiff's other suggested evidence of retaliation–the "availability" statement, and Hoatlin's negative attitude.

The Court finds that the evidence that Plaintiff has put forth: the timing, the "availability" statement; and the increasing negative attitude, taken together, constitutes sufficient evidence to withstand a motion for summary judgment.  Plaintiff recognizes that the timing of the case, taken alone, would put this case on the "borderline" of temporal proximity cases.  (Pl.'s Resp. at 11-12.)  But, the temporal proximity plus the additional testimonial evidence is sufficient to establish a prima facie case under either a single or mixed-motive analysis.

Defendant next argues that the "honest belief" rule should protect it from liability.[4] Plaintiff states that the "honest belief" rule is not applicable in mixed-motive cases, but that, even if this case were governed by the *McDonnell Douglas* burden shifting framework, Plaintiff has raised an issue of fact as to whether Defendant had an "honest belief."

---

[4]The "honest belief" rule applies to FMLA retaliation cases.  *Tillman*, 2013 WL 5539612, at *9 (citations omitted).

19

The honest belief rule provides that, "'as long as an employer has an honest belief in its proffered non-discriminatory reasons,' the employee cannot establish pretext simply because the reason is ultimately shown to be incorrect." *Tillman*, 2013 WL 5539612, at *9 (citations omitted). "When the 'honest belief' rule is invoked, to establish pretext, 'the plaintiff must allege more than a dispute over the facts upon which his discharge was based. He must put forth evidence [that] demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action.'" *Id.* (citation omitted).

To determine whether a defendant had an "honest belief" in the proffered basis for a termination, courts look to whether a defendant company "has established a 'reasonable reliance' on the particularized facts that were before it at the time the decision was made." *Tillman*, 2013 WL 5539612, at *9 (citations omitted). Courts "do not require that the decisional process used by the employer 'be optimal or that it left no stone unturned." *Id.* (citation omitted). "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citations omitted).

Here, on this motion for summary judgment, Defendant is not entitled to the "honest belief" rule and Plaintiff has raised an issue of fact as to whether the termination was based in fact and not, at least in part, on Plaintiff's FMLA leave. Defendant claims that it terminated Plaintiff for her failure to complete the audit reports before the auditors arrived on Monday, February 11, 2013. But Plaintiff has raised factual issues surrounding the termination. She has alleged that she was in communication with Hoatlin regarding the reports over the weekend; while he has alleged that she was not in communication with him

over the weekend. There is a genuine issue of material fact surrounding the pretext argument.  The Court further points out that Hoatlin's decision was made in haste, it did not appear to be a "considered decision." Defendant's "honest belief' argument fails and there are issues of fact surrounding whether Defendant had a reason to terminate Plaintiff.

Plaintiff therefore has made a sufficient showing of a prima facie case to withstand summary judgment on her FMLA retaliation claim.

The Court therefore DENIES Defendant's motion for partial summary judgment on Plaintiff's FMLA claim.

### B. The Court grants in part and denies in part Defendant's motion for partial summary judgment on Plaintiff's FLSA claim

Defendant seeks summary judgment on two aspects of Plaintiff's FLSA claim.  (Def.'s Mot. at 12-14.)  Defendant first seeks a ruling that Plaintiff's overtime recovery is limited to half of the overtime hours she worked under the "fluctuating workweek" rationale.  (*Id.*) Defendant then seeks a ruling that Plaintiff cannot demonstrate "willfulness," therefore making the statute of limitations for this case two years.  (*Id.* at 14.)

#### 1. A factual issue exists as to whether the parties agreed to pay Plaintiff by the fluctuating work week method

Defendant recognizes that fact issues exist for the jury on whether Plaintiff was exempt under the FLSA.  Defendant argues, though, that if Plaintiff were to convince a jury that she was misclassified as a salaried employee, her damages would be limited to "half of her effective hourly rate for overtime" that she establishes at trial.  (Def.'s Mot. at 14.) Defendant argues that this "fluctuating workweek" approach is the appropriate measure of damages.

21

Plaintiff argues that Defendant never paid her under the fluctuating work week model and therefore that any overtime amounts owed to her would be at the FLSA required one-and-one-half times her normal hourly rate for each hour of overtime she worked.[5]

29 CFR § 778.114 is the regulation governing the fluctuating work week model. That regulation explains the premise behind the fluctuating work week model:

> (a) An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works in greatest, and he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less that one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

Broken down, § 778.114 requires four conditions before an employer may apply a fluctuating work week model: (1) the employee's hours fluctuate from week to week; (2) the employee receives a "fixed weekly salary" that does not vary based on the number of

---

[5] *See* 29 U.S.C. § 207(a)(1): [N]o employer shall employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours about specified at a rate not less than one and one-half times the regular rate at which he is employed.

hours worked during the week; (3) the fixed salary provides compensation at a regular rate that is not lower than minimum wage; and (4) there is a "clear mutual understanding" among the parties that the fixed salary is compensation (apart from overtime premiums) for all hours worked each workweek, whatever their number. *Dorsey v. TruGreen Ltd. P'ship*, 13-10412, 2013 WL 6048999, at *8 (E.D.Mich. Nov. 15, 2013) (adopting report and recommendation) (citing  29 CFR § 778.114(a) and (c)).[6]

Whether to apply the fluctuating work week model of calculating damages is a question of law for the Court to decide.  *See Black v. SettlePou, P.C.*, 732 F.3d 492, 496 (5th Cir. 2013) (citations omitted).  But, the Court can only apply that method if there is a clear indication that "the employer and the employee have agreed that the employee will be paid a fixed weekly wage to work fluctuating hours." *Id.* at 498 (citation omitted).

That question, " whether an employer and employee agreed to a fixed weekly wage for fluctuating hours[,] is a question of fact." *Black*, 732 F.3d at 498 (citation omitted).

---

[6] 29 CFR § 778.114(c): The "fluctuating workweek" method of overtime payment may not be used unless the salary is sufficiently large to assure that no workweek will be worked in which the employee's average hourly earnings from the salary fall below the minimum hourly wage rate applicable under the Act, and unless the employee clearly understands that the salary covers whatever hours the job may demand in a particular workweek and the employer pays the salary even though the workweek is one in which a full schedule of hours is not worked.  Typically, such salaries are paid to employees who do not customarily work a regular schedule of hours and are in amounts agreed on by the parties as adequate straight-time compensation for long workweeks as well as short ones, under the circumstances of the employment as whole.  Where all the legal prerequisites for the use of the "fluctuating workweek" method of overtime payment are present, the Act, in requiring that "not less than" the prescribed premium of 50 percent for overtime hours worked be paid, does not prohibit paying more.  On the other hand, where all the facts indicate that an employee is being paid for his overtime hours at a rate no greater than that which he receives for nonovertime hours at a rate no greater than that which he receives for nonovertime hours, compliance with the act cannot be rested on any application of the fluctuating workweek overtime formula.

Here, then, there is an issue of fact whether the parties expressly agreed to a fixed weekly wage for fluctuating hours.   Defendant points to Plaintiff's statement, "I was classified as salary and so my understanding was that I get paid a specific salary[,]" as evidence that Plaintiff agreed to a fluctuating work week.  (Def.'s Mot. at 14-15.)  The Court finds that this statement does not support a fluctuating work week, for there is no agreement in the statement that the parties agreed to one.  The Court reads Plaintiff's statement as the fact that the salary that was offered to her was the amount she was going to receive.  There appears no negotiation.  Plaintiff also testified that she did not know she was entitled to overtime, which the regulation contemplates.  This reading, though, is not determinative of what type of method to apply if Plaintiff is entitled to damages.  The Court finds that there is an issue of fact as to what the parties' understanding regarding Plaintiff's pay would be.

The Court therefore DENIES without PREJUDICE Defendant's motion.  If this case goes to trial, the jury will have to answer whether the parties agreed to a fluctuating work week schedule.  If they did, the Court will apply the fluctuating work week method of damages, if they did not, the Court finds that Plaintiff would be entitled to one-and-one-half times her regular rate for the overtime hours she worked.[7]

---

[7]     The "regular rate" is the "keystone' in determining "the amount of overtime payments necessary to effectuate the statutory purpose."  *Arrington v. Michigan Bell Tel. Co.*, 10-10975, 2012 WL 4868225, at *1 (E.D.Mich. Oct. 15, 2012) (Lawson, J.) (citations omitted).  If an employee's employment contract is for a set amount of money per week and contemplates a fluctuating amount of hours worked, then the fluctuating workweek method of overtime calculation applies.  *Id.* (citations omitted).  The *Arrington* court pointed out that every circuit to address the matter had held so.  *Id.* at *2.  But the court additionally held that the issue was one that it could only resolve after considering the facts presented at trial.  *Id.*
     But if the employment contract is a set amount for forty hours of work per week, then

### 3. Plaintiff has not brought forth any evidence that Defendant's actions were willful

Defendant lastly moves for summary judgment on the FLSA claim on the issue of the

statute of limitations.  Under the FLSA, the statute of limitations for non-willful violations is

two years; for willful violations, the statute is three years.  29 U.S.C. § 255(a).

---

the fluctuating workweek method calculation of overtime pay damages does not apply.

Plaintiff points to *Hasan v. GPM Invs., LLC*, 896 F.Supp.2d 145 (D.Conn. 2012) to argue the impossibility of fulfilling the fluctuating work week requirement in a misclassification case.  (Pl.'s Resp. at 17-18.)

The *Hasan* court held that, in a misclassification FLSA case, "the resultant employment contract will never fulfill any of the requirements of section 778.114," and therefore the defendant would not be able to avail itself of a fluctuating workweek damages calculation.  896 F.Supp.2d at 149.  The court reasoned that "parties who believe that an employee merits no overtime payment cannot simultaneously believe that any overtime will be paid at varying rates."  *Id.*  "Put another way, in a misclassification case, the parties never agreed to an essential term of a fluctuating work week arrangement–that overtime would be paid at different rates dependent on the number of hours worked per week."  *Id.* (citations omitted).  The court stated that, "[t]o assume otherwise converts every salaried position into a position compensated at a fluctuating rate."  *Id.*  The court also pointed out that "misclassified employees will never have received any kind of bonus or premium for overtime."  *Id.* at 150.  The court reasoned that "parties will have explicitly agreed . . . that employees will not extra money for long hours."  *Id.*

In *Black v. SettlePou, P.C.*, 732 F.3d 492, 499 (5th Cir. 2013) the Fifth Circuit found that the district court erred when it applied the fluctuating work week method of calculating damages.  The court reviewed both the plaintiff's contractual employment agreed and the parties' conduct during her time with the defendant employer.  *Id.*  The court noted that the plaintiff testified that she was paid to work thirty seven and a half hours per week.  *Id.* at 499-500.  The court further noted that her payroll record showed that the defendant compensated her for full time employment and the defendant's employee handbook defined full time as anyone who worked thirty seven and a half hours per week.  *Id.* at 500.  The court reviewed the hours she worked as well.  *Id.*  The court found that the plaintiff, when she worked over the full time amount of hours, complained verbally and in writing, and asserted that she was entitled to overtime pay.  *Id.* at 501.  The *Black* court pointed out that "[the plaintiff's] conduct in her continued protests of [the defendant's] failure to compensate her for her overtime hours . . . shows that she did not agree that her fixed weekly salary should compensate her for all of the hours she worked each week."  *Id.* at 501.  Stated again, the court noted that "[b]y immediately and repeatedly voicing her disagreement with her lack of overtime pay after being reclassified as exempt, [the plaintiff] did much, short of quitting her job, to show that she did not agree that her fixed weekly salary was intended to compensate her for all of the hours she worked each week."  *Id.*

Defendant seeks to limit Plaintiff's damage claim to two years from her filing date.

A plaintiff that alleges willful conduct must prove "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Abadeer v. Tyson Foods, Inc.*, —F.Supp.2d—, 2013 WL 5409190, at *12 (M.D.Tenn. Oct. 3, 2013) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). "Willful" is synonymous with "voluntary," "deliberate," and "intentional," and is "generally understood to refer to conduct that is not merely negligent." *Id.* (citation omitted).

Courts have found willfulness in situations where the defendant had previous Department of Labor investigations regarding overtime violations, prior agreements to pay unpaid overtime wages, and assurances of future compliance. *Abadeer*, 2013 WL 5498190, at *12 (citations omitted). Courts have also found willfulness in situations "in which the employer deliberately chose to avoid researching the laws' terms or affirmatively evading them." *Cook v. Carestar, Inc.*, 11-00691, 2013 WL 5477148, at *13 (S.D.Ohio Sept. 13, 2013) (citation omitted). "A willful violation requires that the employer acted recklessly, at least; it is not sufficient that the employer acted unreasonably." *Id.* (citation omitted).

Plaintiff argues that a genuine issue of fact exists as to whether Defendant willfully or recklessly disregarded its FLSA obligations. (Pl.'s Resp. at 20.) Plaintiff states that Defendant has offered no evidence that it took any steps to determine FLSA requirements or determine whether Plaintiff was exempt from FLSA overtime provisions. (*Id.*) Plaintiff adds that Defendant has pointed to no legal advice that it received, no Department of Labor bulletin on which it relied, or any other evidence that it attempted to determine its

26

obligations under the FLSA.  (*Id.*)  Plaintiff maintains that "[s]uch failure to inquire constitutes reckless disregard for whether its misclassification of [Plaintiff] was willful."  (*Id.*)

Defendant argues that it paid Plaintiff more than twice the minimum required amount, gave Plaintiff generous bonuses, and gave her extensive vacation time.  (Def.'s Reply at 7.)  Defendant asserts that Plaintiff has not brought forth any evidence of willfulness, which is her burden.  (*Id.*)

The Court agrees with Defendant.  Plaintiff has the burden to bring forth evidence that Defendant's actions concerning the FLSA were willful, and she has not done so.  She has not brought forth any evidence that Defendant had any prior violations of the FLSA or that she ever complained to Defendant about overtime or not being compensated for overtime.  This failure, the Court finds, entitles Defendant to summary judgment on this issue.  The statute of limitations that applies to this action is two years.

## IV.  Conclusion

For the above-stated reasons, the Court DENIES in PART and GRANTS in PART Defendant's motion for partial summary judgment.

                              s/Nancy G. Edmunds_____
                              Nancy G. Edmunds
                              United States District Judge

Dated:  April 11, 2014

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 11, 2014, by electronic and/or ordinary mail.

                              s/Carol J. Bethel_____
                              Case Manager

27